### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>ASHLEY L. EHMKE<br><br>Debtor. | Bankruptcy Case No. 22-13092 TBM<br><br>Chapter 13 |

| | |
|---|---|
| In re:<br><br>ASHLEY CAMPBELL, INC.,<br><br>Debtor. | Bankruptcy Case No. 22-13187 TBM<br>Chapter 11, Subchapter V |

## MEMORANDUM OPINION AFTER TRIAL ON CLAIMS OBJECTIONS

## I.   Introduction.

Ashley L. Ehmke ("Ms. Ehmke") filed for protection under Chapter 13 of the Bankruptcy Code.[1]  Ms. Ehmke also caused her wholly-owned interior design company, Ashley Campbell, Inc. ("ACI"), to file a bankruptcy petition under Chapter 11 of the Bankruptcy Code.  So, there are two Debtors in two separate bankruptcy proceedings under two different Chapters of the Bankruptcy Code.

Ms. Ehmke's father, Larry Homuth ("Mr. Homuth"), asserts that he loaned Ms. Ehmke and ACI $379,100.64 pursuant to a promissory note dated August 1, 2009.  He contends that $315,505.76 is still owing.  And, he wants the money back.  Mr. Homuth sued his daughter and ACI in State Court for breach of contract.  Before trial, Ms. Ehmke and ACI started their two bankruptcy cases.  So, the contract dispute remained unresolved.  Mr. Homuth filed a proof of claim against Ms. Ehmke in her individual case and a virtually identical proof of claim against ACI in its corporate restructuring, both asserting breach of contract.

Ms. Ehmke and ACI objected to Mr. Homuth's proofs of claim in the two bankruptcy cases on substantially similar grounds: an accord and satisfaction defense.  Mr. Homuth responded and claims that he is owed the full amount stated in the proofs of claim.  At the joint request of Ms. Ehmke, ACI, and Mr. Homuth, the Court joined the

---

[1]      11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

two contested claims objections in the two separate bankruptcy cases together for a joint trial.

Having conducted the trial, the Court must decide whether to allow or disallow Mr. Homuth's proofs of claim against Ms. Ehmke and ACI. After considering the evidence (both testimonial and documentary), the Court decides, for the reasons explained in more detail below, that Mr. Homuth's claims must be disallowed in their entirety.

## II.      Jurisdiction and Venue.

Pursuant to 28 U.S.C. § 1334, this Court has subject matter jurisdiction to adjudicate the objections to Mr. Homuth's claims. Such issues are core proceedings per 28 U.S.C. §§157(b)(2)(A)(matters concerning administration of the estate), (b)(2)(B)(allowance or disallowance of claims against the estate), and (b)(2)(O)(other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship). Further, venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## III.      Procedural Background.[2]

## A.      The Ehmke Bankruptcy Case.[3]

### 1.      General Background Concerning the Ehmke Bankruptcy Case.

Ms. Ehmke filed a Petition for protection under Chapter 13 of the Bankruptcy Code on August 18, 2022 in the case captioned: *In re Ashley L Ehmke,* Case No. 22-13092 (Bankr. D. Colo.) (the "Ehmke Case").[4]  Thereafter, she filed a series of Chapter 13 plans culminating in an "Amended Chapter 13 Plan," dated December 21, 2022 (the "Ehmke Plan").[5]  Under the Ehmke Plan, Ms. Ehmke committed to make 4 monthly payments of $5,000 and 56 monthly payments of $6,250 (for an aggregate of $370,000) to the Chapter 13 trustee for the benefit of creditors. On March 8, 2023, the Court confirmed the Ehmke Plan.[6]

---

[2]      The Court takes judicial notice of the docket in Ehmke Case and the ACI Case. *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket and the facts that are part of public records).
[3]      Unless otherwise indicated, the Court will refer to particular documents from the CM/ECF docket for *In re Ashley L. Ehmke*, Case No. 22-13092 (Bankr. D. Colo.), using the convention: "Ehmke Docket No. ___." Similarly, the Court will refer to particular documents from the CM/ECF docket for *In re Ashley Campbell, Inc.*, Case No. 22-13187 (Bankr. D. Colo.) using the convention: "ACI Docket No. ___."
[4]      Ehmke Docket No. 1.
[5]      Ehmke Docket No. 67.
[6]      Ehmke Docket No. 144.

2

2.      <u>**The Homuth-Ehmke Claim and Ehmke Objection**</u>.

On her Schedule E/F filed along with her Petition, Ms. Ehmke identified Mr. Homuth as a non-priority unsecured creditor holding a contingent, unliquidated, and disputed claim for $0 based on a contract.[7]  On October 23, 2022, Mr. Homuth filed Proof of Claim No. 10-1 in the Ehmke Case (the "Homuth-Ehmke Claim").[8]  In the Homuth-Ehmke Claim, Mr. Homuth asserted a $315,505.76 debt allegedly secured by "business assets" pursuant to a "UCC-1."  The Homuth-Ehmke Claim is one of the largest claims asserted in the Ehmke Case.  Mr. Homuth identified the basis of the debt as "money loaned" as evidenced by an attached promissory note.  Furthermore, Mr. Homuth attached a written explanation and the following summary of "Homuth Note Balance and Payment Details" (the "Homuth Claim Summary"):

---

[7]     Ehmke Docket No. 1 at 30.

[8]     Ex. 2.

October 23, 2022 | Larry Homuth - Creditor | Loan Summary Details

| **Homuth Note Balance and Payment Details** | **Amount of Payments** | **Additional Information** | **Balance of Loan** |
|---|---|---|---|
| Balance of Loan as of 12/31/15 | $155,994.60 | Balance from Defendants' Supplemental Disclosures (CAM 001570) | |
| payments made by ACI in 2016 | $ 15,600.00 | | $ 140,394.60 |
| 4% interest 2016 | $ 5,615.78 | | $ 146,010.60 |
| payments made by ACI in 2017 | $ 6,000.00 | | $ 140,010.60 |
| 4% interest 2017 | $ 5,600.42 | | $ 145,610.60 |
| payments made by ACI in 2018 | $ 9,000.00 | | $ 136,610.60 |
| 4% interest 2018 | $ 5,464.24 | | $ 142,075.02 |
| payments made by ACI in 2019 | $ 8,250.00 | | $ 133,825.02 |
| 4% interest 2019 | $ 5,353.00 | | $ 139,178.02 |
| payments made by ACI in 2020 | $ 6,750.00 | | $ 132,428.02 |
| 12% interest 2020 (amount of interest pursuant to Note due to breach) | $ 15,891.36 | | $ 148,319.38 |
| 12% interest 2021 (amount of interest pursuant to Note due to breach) | $ 17,798.33 | | $ 166,117.71 |
| 2022 interest (through 08/2022 -PRE PETITION ONLY) | $ 13,289.42 | | $ 179,407.13 |
| rescinded gift 2012 (due to breach) | $ 13,000.00 | | $ 192,407.13 |
| rescinded gift 2013 (due to breach) | $ 14,000.00 | | $ 206,407.13 |
| rescinded gift 2014 (due to breach) | $ 14,000.00 | | $ 220,407.13 |
| rescinded gift 2015 (due to breach) | $ 14,000.00 | Total amount due (without reasonable attorney fees/costs) | $ 234,407.13 |
| Reasonable Attorney Fees & Costs (estimated) | $ 81,098.63 | Total Due WITH Reasonable Attorney Fees/Costs | $ 315,505.76 |

Proof of Claim - Exhibit 2

Thereafter, on October 25, 2022, Ms. Ehmke submitted an "Objection to Claim No. 10-1 filed by Larry Homuth" (the "Ehmke Objection").[9]  Mr. Homuth countered with his "Response" (the "Homuth-Ehmke Response") to the Ehmke Objection.[10]  A few months later, Ms. Ehmke filed a "Motion for Summary Judgment" (the "Ehmke MSJ") on the Ehmke Objection.[11]  Mr. Homuth opposed the Ehmke MSJ.[12]  Thereafter, the Court denied the Ehmke MSJ and set the dispute for trial.[13]  The day after denial of the Ehmke MSJ, Ms. Ehmke submitted an "Amended Objection to Claim No. 10-1 filed by Larry Homuth" (the "Ehmke Amended Objection").[14]  As set forth below, the Homuth-Ehmke Claim, Ehmke Objection, and Ehmke Amended Objection later were joined for trial along with a related contested matter.

## B.    The ACI Bankruptcy Case.

### 1.    General Background Concerning the ACI Bankruptcy Case.

A few days after Ms. Ehmke filed the Ehmke Case, Ms. Ehmke caused her wholly-owned interior decoration business, ACI, to file a Petition for protection under Subchapter V of Chapter 11 of the Bankruptcy Code on August 24, 2022 in the case captioned: *In re Ashley Campbell, Inc.,* Case No. 22-13187 (Bankr. D. Colo.) (the "ACI Case").[15]  Joli A. Lofstedt was appointed as the Subchapter V Trustee in the ACI Case.[16]  The ACI Case is closely related to the Ehmke Case because Ms. Ehmke owns, controls, and operates ACI and also because of significant overlapping debt.

Thereafter, ACI submitted a series of Chapter 11 plans culminating in a "Subchapter V Plan of Reorganization Dated March 6, 2023" (the "ACI Plan").[17]  The ACI Plan proposes that ACI will continue in its interior design operations and pay creditors through income generated by ACI's business activities.  The ACI Plan has not been confirmed by the Court.

### 2.    The Homuth-ACI Claim and ACI Objection.

On its Schedule E/F filed along with its Petition, ACI identified Mr. Homuth as a non-priority unsecured creditor holding a contingent, unliquidated, and disputed claim for $0 based on a contract.[18]  On October 23, 2022, Mr. Homuth filed Proof of Claim No. 1-1 in the ACI Case (the "Homuth-ACI Claim").[19]  In the Homuth-ACI Claim, Mr. Homuth asserted a $315,505.76 debt allegedly secured by "business assets" pursuant to a

---

9     Ehmke Docket No. 25.
10    Ehmke Docket No. 40.
11    Ehmke Docket No. 74.
12    Ehmke Docket No. 88.
13    Ehmke Docket No. 96.
14    Ehmke Docket No. 100.
15    ACI Docket No. 1.
16    ACI Docket No. 15.
17    ACI Docket Nos. 48, 52, and 99.
18    ACI Docket No. 22 at 8.
19    Ex. 2.

"UCC-1." The Homuth-ACI Claim is one of the largest claims asserted in the ACI Case. Mr. Homuth identified the basis of the debt as "money loaned" as evidenced by an attached promissory note. Furthermore, Mr. Homuth attached a written explanation and the exact same Homuth Claim Summary submitted with the Homuth-Ehmke Claim. In fact, the Homuth-Ehmke Claim and the Homuth-ACI Claim are virtually identical.

Thereafter, on November 18, 2022, ACI submitted an "Objection to Claim No. 1-1 filed by Larry Homuth" (the "ACI Objection").[20] Mr. Homuth countered with his "Response" (the "Homuth-ACI Response") to the ACI Objection.[21] As set forth below, the disputed matter of the Homuth-ACI Claim and ACI Objection later were joined for trial along with a related contested matter.

**C.      Joinder of Contested Matters and Pretrial Proceedings.**

Given the similarity of the contested matters concerning the Homuth-Ehmke Claim, Ehmke Objection, and Ehmke Amended Objection on the one hand and the Homuth-ACI Claim and ACI Objection on the other hand, Ms. Homuth and ACI requested that the contested matters be consolidated for pretrial and trial proceedings.[22] Mr. Homuth concurred.[23] Accordingly, the Court established joint pre-trial procedures and scheduled a joint trial on the Homuth-Ehmke Claim, Ehmke Objection, Ehmke Amended Objection, Homuth-ACI Claim, and ACI Objection.[24]

**D.      Trial.**

The Court conducted a joint trial on the Homuth-Ehmke Claim, Ehmke Objection, Ehmke Amended Objection, Homuth-ACI Claim, and ACI Objection on March 3, 2023.[25] At the trial, the Court received testimony from three witnesses: Ms. Ehmke; Mr. Homuth; and Gail Mahoney (Mr. Homuth's former spouse and mother of Ms. Ehmke). The Court also admitted into evidence Mr. Homuth's Exhibits 1-6 and 8-13 along with the joint Debtors' Exhibits C, D, and E. After the completion of the evidence, the Court entertained fulsome closing argument from counsel for Mr. Homuth, Ms. Ehmke, and ACI. The Court also directed post-trial legal briefing on certain discrete issues. Mr. Homuth, Ms. Ehmke, and ACI filed their post-trial legal briefs.[26]

Thereafter, the Court took the contested matters concerning the Homuth-Ehmke Claim, Ehmke Objection, Ehmke Amended Objection, Homuth-ACI Claim, and ACI Objection under advisement. In the interim, the Court has considered all the testimony, re-reviewed the admitted exhibits, and evaluated the applicable law. Accordingly, the foregoing matters are ripe for decision.

---

[20]      ACI Docket No. 40.
[21]      ACI Docket No. 44.
[22]      ACI Docket No. 60.
[23]      ACI Docket No. 88.
[24]      Ehmke Docket No. 70; ACI Docket No. 89.
[25]      Ehmke Docket No. 133; ACI Docket No. 100.
[26]      Ehmke Docket Nos. 155 and 156; ACI Docket Nos. 111 and 112.

## IV.    Factual Findings.

Based upon the evidence presented at the trial, including the testimony and admitted exhibits, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

### A.    Relationship Between the Parties.

Mr. Homuth is Ms. Ehmke's father.  Ms. Mahoney is Mr. Homuth's former spouse and Ms. Ehmke's mother.  Ms. Ehmke was formerly known as Ashley Campbell.  (For purposes of avoiding confusion, the Court refers to Ms. Ehmke only by that name.)

Mr. Homuth and Ms. Mahoney started an interior design firm in Wisconsin.  They operated it together for about 30 years.  Ms. Ehmke worked for the company.  In 2005, Ms. Ehmke (then 22 years old) was bitten by an entrepreneurial bug and decided to start her own business, ACI, along with her then-husband Chase Campbell ("Mr. Campbell").  ACI is a corporation.  Ms. Ehmke is the sole shareholder, officer, and manager of ACI.[27]  She controls ACI.  Since its formation in 2005, ACI has conducted operations as an interior design company.

### B.    Mr. Homuth Assists Ms. Ehmke and ACI (Circa 2005-2009).

Since Ms. Ehmke was a young woman with little experience in business, and given their familial relationship, Mr. Homuth wanted to assist his daughter.  First, Mr. Homuth cautioned Ms. Ehmke about her lack of experience and the dangers of Ms. Ehmke going into business with a spouse.[28]  But, Ms. Ehmke wanted to go ahead with the enterprise.  So, Mr. Homuth decided to help.

After ACI was formed, Mr. Homuth provided business advice to Ms. Ehmke.  He obtained a real estate lease for ACI and paid rent for ACI.  Mr. Homuth purchased furniture and inventory for ACI.  Starting in approximately 2005, at the request of Ms. Ehmke and Mr. Campbell, Mr. Homuth also loaned money "as needed" to assist in ACI's business.[29]  The Court received extremely scant evidence about the financial

---

[27]    Ms. Ehmke currently is the sole shareholder, officer, and manager of ACI.  The Court did not receive any evidence concerning whether Ms. Ehmke's former spouse, Mr. Campbell, ever held an ownership interest in ACI.

[28]    In 2005, Mr. Homuth was divorced from his long-time spouse (Ms. Mahoney) who also was his business partner.

[29]    The Court observes that in her testimony Ms. Ehmke sometimes characterized the funds advanced by Mr. Homuth as a "gift" or as "gifts."  And, in the State Court Case, Ms. Ehmke and ACI characterized the funds as being "gifted."  (Ex. 2.)  The Court accepts that Ms. Ehmke herself is uncertain or unclear concerning the initial advances of funds.  However, the Court decides as a matter of fact that the funds advanced by Mr. Homuth were loaned rather than gifted.  The Court reaches this factual determination because: (1) Ms. Ehmke also sometimes testified that the funds were loaned; (2) Ms. Ehmke executed an Affidavit swearing that Mr. Homuth "loaned money to me for my business" (Ex. 3.); (3) ACI's check register for the years 2006 through 2013 referred to payments to Mr. Homuth as "for Loan" and "for Loan Payment" and "for Loan Repayment" (Exs. C and D.); (4) a few of the checks written

arrangements between Mr. Homuth, Ms. Ehmke, and ACI during the period from 2005 through 2009.[30]  For example, the Court received no evidence regarding: (1) the amount of funds advanced by Mr. Homuth to Ms. Ehmke and/or ACI from 2005 through 2009; (2) whether the funds were paid to Ms. Ehmke or ACI; (3) whether some of the funds may have been paid to third parties (such as ACI's landlord and/or vendors); or (4) the terms for repayment of the advanced funds.  According to his own testimony, the funds advanced by Mr. Homuth were "not documented" between 2005 through 2009.  The Court received no checks, wire transfer evidences, bank statements, or accounting ledgers proving that any amounts were actually advanced by Mr. Homuth.  But he must have loaned something because ACI's business checking account register shows a smattering of payments made by ACI to Mr. Homuth "for Loan," "for Loan Payment" and "for Loan Repayment" between 2005 and 2009 as follows:

| Date of Check | Amount |
|---|---|
| March 22, 2006 | $  5,720.79 |
| April 20, 2006 | $15,000.00 |
| October 13, 2006 | $     127.00 |
| February 11, 2008 | $  5,000.00 |
| March 7, 2008 | $  5,058.18 |
| April 1, 2008 | $  5,058.18 |
| August 6, 2008 | $  6,082.18 |
| Early ACI Payments Subtotal: | $42,046.33[31] |

The foregoing payments were not made at regular time intervals and not made in similar amounts.  Since the parties presented very limited evidence on the topic, the foregoing list of payments may be incomplete.

---

from ACI to Mr. Homuth from 2013 through 2015 indicated that the purpose of the checks was "for Reimbursement" or "Loan Reimbursement; (5) Mr. Homuth testified repeatedly that he loaned funds; and (6) Ms. Ehmke and ACI (as well as others) executed a Promissory Note, dated August 1, 2009, promising to repay $379,100.64 in principal plus interest (Ex. 1 at 6.)  To the extent that the foregoing is a legal conclusion rather than a factual finding, the Court makes the legal conclusion that the funds advanced by Mr. Homuth were loans, not gifts.

[30]        The lack of evidence concerning financial matters is extremely notable even accepting that ACI was a small company and Mr. Homuth and Ms. Ehmke were father and daughter.

[31]        Ex. C.  Neither Mr. Homuth, Ms. Ehmke, nor ACI presented the Court with a list of payments during such period.  However, the Court has prepared the foregoing list of payments based upon ACI's check register.

C.      **The Promissory Note**.

Given the dearth of documentation concerning the financial arrangements between Mr. Homuth, Ms. Ehmke, and ACI, Mr. Homuth decided to formalize the arrangement in 2009.  Somehow (the Court is quite unsure how), Mr. Homuth reached the conclusion that ACI, Ms. Ehmke, Mr. Campbell, and Tyler Conley (whose role was a business partner with Ms. Ehmke), owed Mr. Homuth "the principal sum" of $379,100.64.  The Court received no evidence supporting the calculation from Mr. Homuth.

Regardless, Mr. Homuth prepared a promissory note and presented it to them. Thereafter, ACI, Ms. Ehmke, Mr. Campbell, and Tyler Conley ("Mr. Conley") together as co-makers all executed a Promissory Note (the "Promissory Note"), dated August 1, 2009, in the original principal amount of $379,100.64 plus "4% per annum" interest payable to Mr. Homuth over a term of almost seven years.[32]  The Promissory Note required monthly installment payments of principal and interest in the amount of $5,181.85 commencing on August 31, 2009 (and at the end of each month thereafter) through the June 30, 2016 maturity date.  Upon default, the Promissory Note provided for a "late charge" and an increased default interest rate at "12% per annum."  And, the Promissory Note allowed for recovery by Mr. Homuth of "reasonable attorney's fees and all expenses incurred in connection [with collection]."  The Promissory Note purported to be secured by a Security Agreement executed by ACI pledging as collateral ACI's inventory, accounts receivable, furniture, fixtures, equipment, tools, supplies, insurance policies, and certain other collateral.[33]  No UCC-1 Financing Statement ever was filed with the Colorado Secretary of State to perfect the alleged security.

In any event, after execution of the Promissory Note, ACI made sporadic payments to Mr. Homuth "for Loan," "for Loan Payment" and "for Loan Repayment" between 2009 and 2016 as evidenced by ACI's check register and some checks as follows:

| Date of Check | Amount |
|---|---|
| September 4, 2009 | $ 5,081.85 |
| September 27, 2011 | $ 5,600.00 |
| December 13, 2011 | $ 5,600.00 |
| April 17, 2012 | $ 5,100.00 |
| June 7, 2012 | $ 5,100.00 |
| Unknown | $ 10,000.00 |
| December 27, 2012 | $ 5,100.00 |
| February 6, 2013 | $ 5,100.00 |
| March 13, 2013 | $ 5,100.00 |
| April 2, 2013 | $ 5,100.00 |
| June 18, 2013 | $ 10,200.00 |

---

[32]     Ex. 1 at 6.

[33]     *Id*. at 7-11,

| | |
|---|---|
| August 12, 2013 | $ 10,200.00 |
| September 10, 2013 | $  5,100.00 |
| October 16, 2013 | $ 10,200.00 |
| November 27, 2013 | $ 10,200.00 |
| January 27, 2014 | $ 15,300.00 |
| February 28, 2014 | $  5,100.00 |
| March 4, 2014 | $  5,100.00 |
| August 6, 2014 | $ 15,300.00 |
| September 9, 2014 | $  5,200.00 |
| April 24, 2015 | $ 20,000.00 |
| July 27, 2015 | $ 10,400.00 |
| September 11, 2015 | $ 20,000.00 |
| | |
| 2006-2015 | |
| ACI Payments Subtotal: | $199,181.85[34] |

The foregoing payments were not made at regular time intervals and not made in similar amounts.  Notably, none of the foregoing payments were made in the amount required for monthly payments under the Promissory Note: $5,181.85.  Give the death of evidence, the foregoing list of payments may be incomplete.  The Court received no checks or check registers showing payments made in 2016.  However, Mr. Homuth acknowledged at least $15,600 of additional payments from ACI made to him in 2016.[35]  The Court does not know whether the other co-makers of the Promissory Note (Mr. Campbell and Mr. Conley) paid Mr. Homuth anything on the Promissory Note.

**D.      The March 2017 Agreement.**

In the spring of 2017, Mr. Homuth and Ms. Ehmke engaged in communications regarding the amounts Mr. Homuth alleged were due under the Promissory Note.   In an e-mail dated February 14, 2017, Mr. Homuth asserted that $171,076 was due as of December 31, 2015 but that such amount should be further reduced by: "(1) $16,000 gift for 2015; (2) $16,000 gift for 2016; (3) $15,600 payments in 2016; (4) $16,000 gift for 2017; and (5) $16,000 gift for 2018."[36]  Thus, Mr. Homuth asserted a "balance to be amortized" of "$91,476."[37]

The Court received no evidence how Mr. Homuth computed the $171,076 allegedly due as of December 31, 2015.  And, the message seemed to acknowledge $15,600 of payments in 2016 (which were not included in the payments listed immediately above because the Court did not receive specific evidence of such payments).  The Court received no evidence about payments made by Mr. Campbell

---

[34]      Exs. C and D.  Neither Mr. Homuth, Ms. Ehmke, nor ACI presented the Court with a list of payments during the period between 2009 and 2016.  However, the Court has prepared the foregoing list of payments based upon ACI's check register and some checks.

[35]      Ex. 5.

[36]      Ex. 4 at 1.

[37]      *Id.*

and Mr. Conley under the Promissory Note.  However, the Homuth-Ehmke Claim and the Homuth-ACI Claim cryptically state that "[e]ach co-signor [Mr. Campbell and Mr. Conley], with consideration paid to the Debtor were separately released from the [Promissory] Note obligations, leaving the Debtor to satisfy the remaining obligation." Mr. Homuth did not produce the purported releases nor account for any consideration provided by either Mr. Campbell or Mr. Conley.

In any event, on March 1, 2017, Ms. Ehmke wrote ACI's accountant (Zachry Crow at Rubin Brown) and instructed him to begin paying Mr. Homuth $750 per month "each month on the first" from ACI's account.[38]  The next day (March 2, 2017), ACI paid Mr. Homuth the first $750 installment as directed by Ms. Ehmke.[39]  A few days later, in a pivotal e-mail message (dated March 6, 2017), Mr. Homuth appeared to confirm and agree to a $750 per month payment plan to pay off whatever obligation ACI and Ms. Ehmke owed to Mr. Homuth.[40]  This is what the March 6, 2017 e-mail message stated:

> **From:** larry homuth <lars4550@hotmail.com>
> **Sent:** Monday, March 6, 2017 1:13 PM
> **To:** Ashley Campbell <ashley@ashleycampbell.com>
> **Subject:** Re: 2016 1099
>
> Hi Ash--Thanks for the check.
>
> I am no accountant, but here is an amortization schedule that I worked out using simple interest.  I have employed the maximum allowable non-taxable gifting per year, but I must add the interest dictated by the note or I will pay tax on that.  As you can see, you will pay a total of $34,500 for the actual debt of $125,476 (171,076 less the wrongly applied 30,000 and the 15,600 paid in 2016), so...a pretty good deal.  If you can use this, maybe you can save a few bucks on paying your accountant to sort it out??? Love, Dad

So, the March 6, 2017 e-mail acknowledged the $750 payment made a few days earlier. Then, the message tied back to the amount asserted by Mr. Homuth as due in the February 14, 2017 e-mail ($171,076), subtracted another payment ($30,000) which apparently had not been correctly applied to the debt, and subtracted some payments in 2016 plus other amounts.  In the end, Mr. Homuth proposed that ACI and Ms. Ehmke would be obligated to pay only $34,500 more to extinguish the debt under the Promissory Note which he characterized as "a pretty good deal."

The March 6, 2017 e-mail refers to an attachment (*i.e.* "here is an amortization schedule that I worked out").[41]  This is the attachment:

---

[38]     *Id*. at 3.
[39]     Ex. 6 at 6.
[40]     Ex. 5 at 1.
[41]     Ex. 5 at 2.

## Ashley Loan Payout

Calculation to present day

| | |
|---|---:|
| 12-31-15 due from ACID balance sheet | 171,076 |
| Deduction for accounting error (added payment from LizA to debt) | - 30,000 |
| Deduction for max allowable gift 2015 | - 14,000 |
| Deduction for max allowable gift 2016 | - 14,000 |
| Deduction for payments 2016 | - 15,600 |
| Forgive interest in 2016 to date | |
| Balance due 3-1-17 | $ 97,476 |
| Payments in 2017: 10 @ 750 | - 7,500 |
| Deduction for max allowable gift in 2017 | - 14,000 |
| Balance due 12-31-17 | $ 75,976 |
| 4% interest on 12-31-17 balance for 2017 | + 3,039 |
| Payments for 2018: 12 @ 750 | - 9,000 |
| Deduction for max allowable gift in 2018 | - 14,000 |
| Balance due 12-31-18 | $ 56,015 |
| 4% interest on 12-31-18 balance | + 2,240 |
| Payments for 2019: 12 @ 750 | - 9,000 |
| Deduction for max allowable gift in 2019 | - 14,000 |
| Balance due 12-31-19 | $ 35,255 |
| 4% interest on 12-31-19 balance | + 1,410 |
| Payments for 2020: 12 @ 750 | - 9,000 |
| Deduction for max allowable gift in 2020 | - 14,000 |
| Balance due 12-31-20 | $ 13,665 |
| Max allowable gift in 2021 | - 13,665 |

The Court refers to the foregoing attachment to the March 6, 2017 e-mail as the "Payout Terms." To summarize, the Payout Terms required Ms. Ehmke or ACI to pay 10 payments of $750 in 2017 and 12 payments of $750 in 2018, 2019, and 2020 for a grand total of $34,500. By the time Mr. Homuth sent the March 6, 2017 e-mail and the Payout Terms, ACI had already made the first $750 payment for 2017.

The same day that Mr. Homuth sent the March 6, 2017 e-mail and Payout Terms, Ms. Ehmke responded with apparent agreement stating[42]:

**From:** Ashley Campbell <ashley@ashleycampbell.com>
**Sent:** Monday, March 6, 2017 10:27 PM
**To:** larry homuth <lars4550@hotmail.com>
**Subject:** Re: 2016 1099

Dad,

This looks simple enough for my math-phobic brain to follow. Thank you for taking the time to do this, as well as for your continued generosity.
I apologize for the confusion with Gayle--we have not engaged them for taxes as the new firm does bookkeeping, business and personal taxes, so it seems a bit off-base for her to have sent this. I will try to sort out tomorrow.

Thanks again.

Love,
Ashley

For ease of reference, the Court refers to the March 2, 2017 $750 payment, the two March 6, 2017 e-mails, and the Payout Terms as the "March 2017 Agreement." Ms. Ehmke testified repeatedly that she accepted the March 2017 Agreement and thought she was settling whatever debt, if any, remained due to Mr. Homuth on the Promissory Note. In his testimony, Mr. Homuth did not deny the existence of an agreement based on the Payout Terms and the March 6, 2017 e-mail exchange.

E.     **Payments under the March 2017 Agreement.**

ACI and Ms. Ehmke complied with the March 2017 Agreement. According to cancelled checks admitted into evidence and cashed by Mr. Homuth, ACI made the following payments in 2017[43]:

| Date of Check | Amount |
|---|---|
| March 2, 2017 | $   750.00 |
| March 31, 2017 | $   750.00 |
| April 28, 2017 | $   750.00 |
| May 31, 2017 | $   750.00 |
| July 7, 2017 | $   750.00 |
| September 12, 2017 | $   750.00 |
| September 29, 2017 | $1,500.00 |
| December 3, 2017 | $1,500.00 |
| December 29, 2017 | $   750.00 |

---

[42]     Ex. 4 at 2.
[43]     Ex. 6. Neither Mr. Homuth, Ms. Ehmke, nor ACI presented the Court with a list of payments during such period. However, the Court has prepared the foregoing list of payments based upon ACI's cancelled checks.

13

2017 Payments Subtotal:                $8,250.00

Under the Payout Terms, ACI and Ms. Homuth were only supposed to pay $7,500 in 2017.  So, by paying $8,250 in 2017, they overpaid or prepaid $750.  The foregoing list of payments show that payments were not made on the same day every month.  However, nothing in the Payout Terms identified a due date for payments.  Further, the foregoing list of payments show that a few months were skipped and then made up later (but still in 2017).  But, nothing in the Payout Terms required monthly payments.  Instead, the Payout Terms refer only to 10 payments of $750 in 2017.  In any event, Mr. Homuth never complained about the timing of the 2017 payments.

According to cancelled checks admitted into evidence and cashed by Mr. Homuth, ACI made the following payments in 2018[44]:

| Date of Check | Amount |
|---|---|
| January 24, 2018 | $  750.00 |
| March 8, 2018 | $  750.00 |
| March 22, 2018 | $  750.00 |
| May 1, 2018 | $  750.00 |
| June 30, 2018 | $  750.00 |
| July 11, 2018 | $  750.00 |
| August 7, 2018 | $  750.00 |
| August 30, 2018 | $  750.00 |
| September 27, 2018 | $  750.00 |
| October 25, 2018 | $  750.00 |
| November 21, 2018 | $  750.00 |
| December 27, 2018 | $  750.00 |

2018 Payments Subtotal:                $9,000.00

The foregoing complies exactly with the Payout Terms (*i.e.* 12 payments of $750 in 2018).  Mr. Homuth seemed pleased.  He sent an e-mail to Ms. Ehmke on July 23, 2018 under the heading "loan reconciliation" and he wrote:

> Hi Ash — attached is your loan reconciliation.  I REALLY appreciate what you are doing . . . . Love, Dad[45]

Appended to the e-mail, Mr. Homuth attached a printout of the Payout Terms along with his own hand-written notations showing that ACI had paid Mr. Homuth everything required under the Payout terms through July 23, 2018.

---

[44]     Ex. 6.  Neither Mr. Homuth, Ms. Ehmke, nor ACI presented the Court with a list of payments during such period.  However, the Court has prepared the foregoing list of payments based upon ACI's cancelled checks.

[45]     Ex. E.

According to cancelled checks admitted into evidence and cashed by Mr. Homuth, ACI made the following payments in 2019[46]:

| Date of Check | Amount |
|---|---|
| January 23, 2019 | $  750.00 |
| February 27, 2019 | $  750.00 |
| March 20, 2019 | $  750.00 |
| April 27, 2019 | $  750.00 |
| May 23, 2019 | $  750.00 |
| June 27, 2019 | $  750.00 |
| July 26, 2019 | $  750.00 |
| August 28, 2019 | $  750.00 |
| September 20, 2019 | $  750.00 |
| October 17, 2019 | $  750.00 |
| December 11, 2019 | $  750.00 |
| 2019 Payments Subtotal: | $8,250.00 |

At first blush, it might appear that ACI and Ms. Homuth were a single $750 payment short at the end of 2019.  There was no payment in November 2019 and the annual amount of payments was only $8,250, not $9,000.  However, that fails to acknowledge the credit that ACI and Ms. Ehmke had established by overpaying or prepaying $750 in 2017.  Accounting for that early payment, ACI and Ms. Ehmke complied with all 2019 payments under the Payout Terms.

However, something personal happened in December 2019.  The Court did not receive evidence of all the details.  But on December 7, 2019, Mr. Homuth wrote the following to Ms. Ehmke[47]:

December 7, 2019

Ashley Campbell Interior Design

Ashley Campbell personal address

Ashley:

Your loan payment check for December has not arrived and I would appreciate an honest answer as to whether I should expect that you will be continuing to pay the remaining loan balance.

Based on your lack of response to my Thanksgiving wishes and your ignoring me when face to face in Cherry Creek mall this week, I am assuming you have blocked me from your email/text/phone and do not intend to communicate further, but I would hope that you have the courtesy to tell me about your intentions as to loan payment. Please let me know.  Love, Dad

---

[46]     Ex. 6.  Neither Mr. Homuth, Ms. Ehmke, nor ACI presented the Court with a list of payments during such period.  However, the Court has prepared the foregoing list of payments based upon ACI's cancelled checks.
[47]     Ex. 8.

The message starts by noting that Mr. Homuth had not received the $750 "loan payment check for December" yet.  That is accurate since, as shown above, ACI paid on December 11, 2019.  Neither ACI nor Ms. Ehmke were required to pay earlier.  The reference to "continuing to pay the remaining loan balance" seems to refer back to the Payout Terms.  But then the balance of the note suggests a dramatic personal falling-out between father and daughter.  Mr. Homuth asserted that Ms. Ehmke did not respond to his "Thanksgiving wishes."  And, according to Mr. Homuth, Ms. Ehmke ignored him while at a shopping mall.

The personal issue must have weighed on Mr. Homuth because just a couple days later (on December 12, 2019) he accused Ms. Ehmke and ACI of defaulting on the Payout Terms.  He wrote[48]:

December 12, 2019

Ashley Campbell personally
and
Ashley Campbell, Inc.

Ashley:

This is formal notice that your note executed on August 1, 2009 (personally and corporately) was due on August 1, 2015.  The extended payment plan offered by me on 12/31/2015 which allowed for smaller payments and gifts from me has been adhered to until this month, but you are now in default under section 14 (a) of the August 1, 2009 agreement.  Thus, the full amount due as of todays date is as follows:

| Balance due 12/31/18 | $56,015 |
| Interest 2019 | $ 2,240 |
| Payments 2019 11@750 | $ 8,250 |
| Total due 12/12/19 | $50,005 |

The entire balance will be due by 1/15/20 or collection action will be taken.

Sincerely,

Larry Homuth
2304 S. University Blvd.
Denver, CO 80210

Cc:  Marx Law Office

Mr. Homuth's December 12, 2019 communication is mostly erroneous.  The first sentence refers to a "note executed on August 1, 2009" that allegedly "was due on August 1, 2015."  But the Promissory Note stated that the maturity date was June 30, 2016.  Then, the message refers to an "extended payment plan offered by me on 12/31/2015 which allowed for smaller payments and gifts from me has been adhered to until this month."  But there was no evidence about an "extended payment plan" on December 31, 2015.  The Court determines that Mr. Homuth was referring to the Payout

---

[48]   Ex. 9.

Terms (accepted on March 6, 2017).[49]  In any event, by the time of the December 12, 2019 letter, ACI and Ms. Ehmke had fully complied with the Payout Terms. Nevertheless, Mr. Homuth demanded $50,005.  The Court received no evidence supporting such calculation.  Per the Payout Terms, the remaining obligation would have been only $35,255, not $50,005 after the December 2019 payment had been made.

Around the same time as the personal falling-out and foregoing communications, on December 13, 2019, Ms. Ehmke eloped with her new husband.  Mr. Homuth does not like Ms. Ehmke's new husband.

In any event, despite the personal falling-out and demands by Mr. Homuth, ACI and Ms. Ehmke continued making the required payments under the Payout Terms. According to cancelled checks admitted into evidence and cashed by Mr. Homuth, ACI made the following payments in 2019[50]:

| Date of Check | Amount |
| --- | --- |
| January 15, 2020 | $1,500.00 |
| February 20, 2020 | $ 750.00 |
| April 2, 2020 | $ 750.00 |
| April 29, 2020 | $ 750.00 |
| May 27, 2020 | $ 750.00 |
| June 23, 2020 | $ 750.00 |
| July 23, 2020 | $ 750.00 |
| August 28, 2020 | $ 750.00 |
| September 15, 2020 | $ 750.00 |
| October 29, 2020 | $ 750.00 |
| November 17, 2020 | $ 750.00 |
| 2020 Payments Subtotal: | $9,000.00 |

Interestingly, starting in January 2020 and for most (but not all) of the payments made by ACI in 2020, Mr. Homuth began writing the following notations on the checks before he cashed them: "Under Protest as to Amount Paid" or "Cashed Under Protest of Amount."[51]  But cash them he did.  Ms. Ehmke testified repeatedly that ACI or she paid

---

[49]      The Court reaches that factual conclusion because ACI and Ms. Ehmke had been performing under the Payout Terms and paying Mr. Homuth.  The suggestion of adherence "until this month" seems to be harkening back to the December 7, 2019 message in which Mr. Homuth appeared to contend that ACI and Ms. Ehmke failed to make a payment in December 2019 per the Payout Terms.  And, the December 12, 2019 communication also refers to "gifts" which were part of the Payout Terms.  Also, the first notation on the Payout Terms was "12-31-2015."  So, Mr. Homuth must have been referring to the Payout Terms.

[50]      Ex. 6.  Neither Mr. Homuth, Ms. Ehmke, nor ACI presented the Court with a list of payments during such period.  However, the Court has prepared the foregoing list of payments based upon ACI's cancelled checks.

[51]      Ex. 6.

everything due under the Payout Terms.  That testimony is fully corroborated by the documentary evidence including cancelled checks.  The Court determines that by November 17, 2020, ACI and Ms. Ehmke had satisfied all obligations under the Payout Terms.  In other words, they paid $34,500 — and they did so early.

## F.   The Pre-Bankruptcy State Court Lawsuit.

In 2020, Mr. Homuth sued Ms. Ehmke and ACI in the District Court for the City and County of Denver, Colorado (the "State Court") in the case captioned:  *Larry Homuth v. Ashley Campbell and Ashley Campbell, Inc.*, Case No. 2020-CV-32843 (Denver District Court, Colorado) (the "State Court Case").  In the State Court Case, Mr. Homuth asserted that Ms. Ehmke and ACI were liable to him for breach of contract based on the Promissory Note.  On September 16, 2020, Ms. Ehmke and ACI filed "Defendants' Answer to Plaintiff's Verified Complaint, Counterclaims, and Jury Demand" (the "State Court Answer").[52]  In the State Court Answer, Ms. Ehmke and ACI denied liability to Mr. Homuth for breach of contract, but, they did not use the phrase "accord and satisfaction."  Instead, Ms. Ehmke and ACI asserted a host of affirmative defenses including that "[Mr. Homuth] is estopped by his own conduct to claim any right to damages," "[Mr. Homuth] is seeking to recover more than he is entitled to in this matter," and "[Ms. Ehmke and ACI] performed all duties they owed [Mr. Homuth]."

The State Court Case was hotly contested for about two years.  However, no trial was conducted.  The State Court did not enter judgment on any claims, affirmative defenses, or counterclaims asserted in the State Court Case before Ms. Ehmke and ACI commenced the Ehmke Case and ACI Case in the Bankruptcy Court.

## V.   Conclusions of Law.

## A.   General Statutory Framework for Claims Allowance and Disallowance.

Section 501 provides that a creditor may file a proof of claim.  Section 502 states that a proof of claim filed under Section 501 "is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  When a proof of claim meets the formal requirements of Fed. R. Bankr. P. 3001, such proof of claim constitutes "prima facie evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  To overcome that presumption, "the objecting party has the burden of going forward with evidence supporting the objection."  *Abboud v. Abboud (In re Abboud),* 232 B.R. 793, 796 (Bankr. N.D. Okla.), *aff'd,* 237 B.R. 777 (10th Cir. BAP 1999).  Such evidence must be of probative force equal to that of the allegations contained in the proof of claim.  *Id.*  Once the objecting debtor has reached such threshold, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim.  *Agricredit Corp. v. Harrison (In re Harrison),* 987 F. 2d 677, 680 (10th Cir.1993); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517, 524 (10th Cir. BAP 2001).

---

[52]   Ex. 2.

### B.    **The Homuth Claims Are Disallowed.**

#### 1.    **Breach of Contract Elements.**

The Homuth-Ehmke Claim and the Homuth-ACI Claim (which the Court refers to together as the "Homuth Claims") are both claims for alleged breach of the Promissory Note.  The Homuth Claims assert the same alleged amount owed: $315,505.76.  The allowance or disallowance of the Homuth Claims requires the Court to apply state contract law.  *Grogan v. Garner*, 498 U.S. 279, 283 (1991) ("The validity of a creditor's claim is determined by rules of state law.").  More specifically, Colorado contract law is applicable because the Promissory Note contains a Colorado choice of law provision, payments were required to be made in Colorado, and Mr. Homuth, Ms. Ehmke, and ACI all reside in, or are present in, Colorado.  COLO. REV. STAT. § 4-1-301.[53]

In Colorado, a party seeking recovery for breach of contract must prove the following elements:

> (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.

*W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted); *see also Ute Water Conservancy Dist. v. Fontanari*, 524 P.3d 308, 316 (Colo. App. 2022) (confirming *Diodosio* listing of breach of contract elements); *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1033 (10th Cir. 2018) (same); *McCollam v. Sunflower Bank, N.A.*, 598 F. Supp.3d 1104, 1109 (D. Colo. 2022) (same).

#### 2.    **Affirmative Defenses.**

Parties defending against breach of contract claims typically deny one or more of the foregoing breach of contract elements.  However, defendants also may assert affirmative defenses.   "An affirmative defense ... is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven."  *Medina v. Cath. Health Initiatives*, 2015 WL 13614128, at *1 (D. Colo. May 13, 2015) (quoting *Lane v. Page*, 272 F.R.D. 581, 601 (D.N.M. 2011)); *see also* Charles Alan Wright and Arthur R. Miller, 5 FEDERAL PRACTICE

---

[53]    COLO. REV. STAT. § 4-1-301 is titled "parties' power to choose applicable law" and states:

> Except as otherwise provided in this section, when a transaction bears a reasonable relation to this state and also to another state . . ., the parties may agree that the law either of this state or of such other state . . . shall govern their rights and duties.

COLO. REV. STAT. § 4-1-301(a).  The foregoing statute governs negotiable instruments such as the Promissory Note.

AND PROCEDURE § 1270 (Thompson Reuters 4th Ed. Supp. 2023) (explaining nature of affirmative defenses).  Put another way, "an affirmative defense is not merely a denial of an element of a plaintiff's claim, but rather it is a legal argument that a defendant may assert to require the dismissal of a claim, notwithstanding the plaintiff's ability to prove the elements of that claim."  *Soicher v. State Farm Mut. Auto. Ins. Co.*, 351 P.3d 559, 564 (Colo. App. 2015); *see also* Bryan A. Garner, BLACK'S LAW DICTIONARY 509 (Thompson Reuters 10th Ed. 2014 (affirmative defense means "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true.").

### 3. Accord and Satisfaction Affirmative Defense.

Ms. Ehmke and ACI have both asserted the affirmative defense of accord and satisfaction against the Homuth Claims.  More specifically, in the Ehmke Objection, Ms. Ehmke pled:

> 1.   On March 6, 2017, the Claimant submitted an email to the Debtor, offering an accord and satisfaction as to the balance due under the Claimant's promissory note.  Exhibit 1.

> 2.   Attached to that email was a proposed amortization schedule. Exhibit 2.

> 3.   The Debtor accepted the proffered accord and satisfaction and fully performed her obligations pursuant to the Claimant's offer. Specifically, she paid a total of $28,500.00 to the Claimant as required.  Exhibit 3.

> 4.   Accordingly, the Debtor has fully performed the terms of the accord and satisfaction as set forth by the Claimant. She has no further liability as a matter of law:

>> An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty.  *R.A. Reither Construction, Inc. v. Wheatland Rural Electric Association*, 680 P.2d 1342, 1344 (Colo. App. 1984).  *See also F.D.I.C. v. Inhofe*, 16 F.3d 371, 374 (10th Cir. 1994) ("Accord and satisfaction, then, is the substitution of another agreement between the parties in satisfaction of the former one, and an execution of the latter agreement.").

*Lupia v. Medicredit, Inc.*, 445 F.Supp.3d 1271, 1284 (D. Colo.  2020).[54]

In the Ehmke Amended Objection, Ms. Ehmke asserted the same accord and satisfaction defense (along with also contesting the balance due on the Promissory Note).[55]  Ms. Ehmke also advanced the accord and satisfaction affirmative defense as the basis for the Ehmke MSJ.[56]  ACI parroted the same accord and satisfaction defense in the ACI Objection.[57]

### 4. <u>Ms. Ehmke and ACI Established an Accord and Satisfaction Defense to the Homuth Claims</u>.

According to the most recent Colorado appellate decision on the topic, "[a] party to a contract may ... make an offer for an accord, which, if accepted and satisfied, would absolve it of its obligations under the original contract.  An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's *existing duty*."  *Bd. of Cnty. Comm'r of Adams Cnty. v. City and Cnty. of Denver*, 511 P.3d 692, 704 (Colo. App. 2022) (citing *U.S. Welding, Inc. v. Advanced Circuits, Inc.*, 420 P.3d 278 (Colo. 2018) and *R.A. Reither Constr., Inc. v. Wheatland Rural Elec. Ass'n*, 680 P.2d 1342, 1344 (Colo. App. 1984)).

There are three elements to an accord and satisfaction defense.  The party asserting the defense in a breach of contract case must show that:

> (1) after entering into the initial contract, the parties entered into a later contract; (2) the parties knew or should reasonably have known that the later contract cancelled or changed their remaining rights and duties under the original contract; and (3) the party asserting the defense fully performed the duties it agreed to perform under the later contract.

*Bd. of Cnty. Comm'r of Adams Cnty.*, 511 P.3d at 704.  *See also Hudson v. Am. Founders Life Ins. Co. of Denver*, 377 P.2d 391, 396 (Colo. 1963) ("In order to constitute an accord and satisfaction, it is necessary that the money should be offered in full satisfaction of the demand, and be accompanied by such acts and declarations as amount to a condition that the money, if accepted, is accepted in satisfaction; and it must be such that the party to whom it is offered is bound to understand therefrom that, if he takes it, he takes it subject to such conditions." ); *R.A. Reither Constr.*, 680 P.2d at 1344 ("An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty.  Performance of the accord discharges the original duty."); Colo. Jury Instr., Civil 30:28 (2023) (listing elements of

---

[54]    Ehmke Docket No. 25.
[55]    Ehmke Docket No. 100.
[56]    Ehmke Docket No. 74.
[57]    ACI Docket No. 40.

accord and satisfaction defense).  Ms. Ehmke, ACI, and Mr. Homuth all agree concerning the elements of the accord and satisfaction defense.[58]

"Whether the elements of an accord and satisfaction are present is a question of fact."  *R.A. Reither Constr.,* 680 P.2d at 1344; *see also Bd of Cnty. Comm'r of Adams Cnty.* 511 P.3d at 704 (same); *Lupia v. Medicredit, Inc.*, 445 F. Supp.3d 1271, 1284 (D. Colo. 2020) (same).

### a.    Ms. Ehmke and ACI Established the First Accord and Satisfaction Element.

The Court separately evaluates each of the accord and satisfaction elements.  The first requirement is that: "after entering into the initial contract, the parties entered into a later contract . . . ."  *Bd. of Cnty. Comm'r of Adams Cnty.*, 511 P.3d at 704.  The Court finds that Ms. Ehmke and ACI (along with Mr. Campbell and Mr. Conley) executed the Promissory Note (dated August 1, 2009) and obligated themselves, jointly and severally, to pay Mr. Homuth $379,100.64 plus "4% per annum" interest in monthly installments until maturity on June 30, 2016.  The Promissory Note is the initial contract for purposes of accord and satisfaction.

Then, subsequently, Ms. Ehmke and ACI on the one hand and Mr. Homuth on the other hand entered into a later contract:  the March 2017 Agreement.  The origins of the March 2017 Agreement stem from Mr. Homuth's proposal in his February 14, 2017 e-mail to Ms. Ehmke.  Subsequently, the evidence suggests that Mr. Homuth and Ms. Ehmke further communicated resulting in Ms. Ehmke instructing ACI's accountant to pay Mr. Homuth $750 "each month on the first" from ACI's account.

Mr. Homuth followed up and sent a pivotal message on March 6, 2017 acknowledging the payment.  Then, he prepared what he called an "amortization schedule" (*i.e.,* the Payout Terms).  In his message Mr. Homuth proposed what he characterized as a "pretty good deal": that Ms. Ehmke and ACI "will pay a total of $34,500 for the actual debt of $125,476."  In other words, Mr. Homuth proposed that he would forgive a substantial portion of the debt he asserted was due on the Promissory Note if Ms. Ehmke and ACI paid $34,500 per the requirements of the Payout Terms.  The Payout Terms uses the word "payout" which further confirms Mr. Homuth's intention to enter into a new arrangement.  The Payout Terms required Ms. Ehmke or

---

[58]    Ehmke Docket No. 126 at 2 (Ms. Ehmke and ACI cited *Hudson* factors for accord and satisfaction); Ehmke Docket No. 40 at 4 and ACI Docket No. 55 at 4 (Mr. Homuth cited *Bd. of Cnty. Comm'r of Adams Cnty.* factors*)*.  None of the parties asserted that the Colorado Uniform Commercial Code applies to the issue of accord and satisfaction in this dispute.  However, the Court has considered the issue.  The Promissory Note is a negotiable instrument.  COLO. REV. STAT. § 4-3-104(a).  And, the Colorado Uniform Commercial Code contains a provision titled: "Accord and satisfaction by use of an instrument."  COLO. REV. STAT. § 4-3-311.  However, as the title suggests, that statute pertains to use of an "instrument" to effect an accord and satisfaction.  The March 2017 Agreement was not an "instrument."  COLO. REV. STAT. § 4-3-104(b).  Accordingly, the Court concludes that the Colorado common law of accord and satisfaction governs the dispute.  Through their written and oral legal arguments, the Court understands that Ms. Ehmke, ACI, and Mr. Homuth concur.

ACI to pay 10 payments of $750 in 2017 and 12 payments of $750 in 2018, 2019, and 2020 for a grand total of $34,500.  By the time Mr. Homuth sent the March 6, 2017 e-mail and the Payout Terms, ACI had already made the first $750 payment for 2017.  Since the $750 payments referenced in the Payout Terms differed from the monthly payments set forth in the Promissory Note, it is clear that the Payout Terms are a proposed new deal.

The same day, Ms. Ehmke and ACI confirmed their agreement to the March 6, 2017 e-mail and the Payout Terms through a responding e-mail.  Ms. Ehmke thanked Mr. Homuth for the accommodation and new terms writing "thank you for taking the time to do this [the Payout Terms]."  Ms. Ehmke testified credibly that she and ACI entered into a new agreement to settle whatever debt remained outstanding through the Payout Terms.  Notably, at trial, Mr. Homuth did not deny the existence of a new agreement.  The Court concludes, as a matter of fact, that Ms. Ehmke, ACI, and Mr. Homuth did enter into a new contract: the March 2017 Agreement consisting of the initial payment of $750, the exchange of e-mails on March 6, 2017, and the Payout Terms.

This conclusion is strongly bolstered by subsequent events confirming the new arrangement.  Notably, ACI started making periodic payments of $750 to Mr. Homuth.  For 2017, ACI paid $8,250 (which was actually $750 more than required in the March 2017 Agreement).  And, ACI continued to make $750 periodic payments during 2018.  Mr. Homuth accepted all the payments, cashed all the checks, and never complained.  Quite the opposite.  On July 23, 2018 he wrote an e-mail to Ms. Ehmke stating "attached is your loan reconciliation.  I REALLY appreciate what you are doing."  The reference to "loan reconciliation" further bolsters the existence of a new agreement.  And, in fact, the "loan reconciliation" was the Payout Terms (along with Mr. Homuth's own notations showing that ACI had made all the required $750 payments).  Then, ACI continued to make periodic payments of $750 throughout 2019 and 2020 until the $34,500 had been paid in full.

Mr. Homuth's December 12, 2019 e-mail to Ms. Ehmke further reinforces the existence of a new contract.  He referred to an "extended payment plan offered by me on 12/31/2015."  Although the date was erroneous, the entire context confirms that Mr. Homuth was referring to the Payout Terms as the "plan offered by me."  Since the December 12, 2019 e-mail was more than two and a half years after the March 2017 Agreement, the strong implication is that the "plan" had been accepted by Ms. Ehmke and ACI.  Otherwise, if Ms. Ehmke and ACI had rejected the "extended payment plan [the Payout Terms]" in March 2017, there would no reason to mention it at all.  In any event, Mr. Homuth accepted and cashed all the checks sent from ACI to him from March 2017 to December 2020.

Based on the foregoing, the Court finds as a fact that Ms. Ehmke and ACI on the one hand and Mr. Homuth on the other hand entered into a later contract: the March 2017 Agreement.  *See R.A. Reither Constr.,* 680 P.2d at 1344 ("Whether the elements of an accord and satisfaction are present is a question of fact."); *Bd. of Cnty. Comm'r of Adams Cnty.* 511 P.3d at 704 (same); *Lupia,* 445 F. Supp.3d at 1284 (same).

Alternatively, to the extent that whether "the parties entered into a later contract" is a question of law, the Court reaches the same conclusion. A contract consists of an offer, acceptance, and consideration. *Denver Truck Exch. v. Perryman*, 307 P.2d 805, 810 (Colo. 1957); Colo. Jury Instr., Civil 30:1 (2023) ("A contract is an agreement between two or more persons or entities. A contract consists of an offer and an acceptance of that offer, and must be supported by consideration.") Mr. Homuth acknowledged that he made an offer. And, Ms. Ehmke and ACI accepted the offer without modification through Ms. Ehmke's March 6, 2017 e-mail albeit that she did not use the specific word: "accept." Acceptance also can be evidenced "by act or conduct." *Linder v. Midland Oil Refin. Co.,* 40 P.2d 253, 254 (Colo. 1935) ("An offer and an assent thereto manifested by act or conduct constitutes a contract."); *Terlizzi v. Altitude Mktg, Inc.*, 2018 WL 2196090, at *7 (D. Colo. May 14, 2018) (discussing contract acceptance by conduct). And, the March 2017 Agreement is supported by adequate consideration including continued payment of interest for periods after the maturity of the Promissory Note. *See French v. Com. Credit Co.*, 64 P.2d 127, 129 (Colo. 1936) ("when a valid contract is made to extend the time at which the interest-bearing promissory note or other negotiable paper is to mature, a promise to pay additional interest is a consideration sufficient to support such a contract"). The *French* court also noted that principles of accord and satisfaction also could be applied. *Id*. at 130. So, all the requirements for a later contract — the March 2017 Agreement — have been shown.

### b.   Ms. Ehmke and ACI Established the Second Accord and Satisfaction Element.

The second accord and satisfaction requirement is that: "the parties knew or should reasonably have known that the later contract cancelled or changed their remaining rights and duties under the original contract . . . ." *Bd. of Cnty. Comm'r of Adams Cnty.*, 511 P.3d at 704. The Court finds, as a matter of fact, that Ms. Ehmke, ACI, and Mr. Homuth all knew (or should reasonably have known) that the March 2017 Agreement changed their remaining rights and duties under the Promissory Note. After all, that was the entire purpose of the March 2017 Agreement. According to Mr. Homuth, the March 2017 Agreement was an "extended payment plan." The terms of the March 2017 Agreement extended beyond the maturity date of the Promissory Note. And, the March 2017 Agreement provided for periodic payments in amounts different than in the Promissory Note. Under the Payout Terms, Ms. Ehmke and ACI agreed to make 10 payments of $750 in 2017 and 12 payments annually for the next three years. That differs from the monthly payments of $5,181.85 set forth in the Promissory Note.

### c.   Ms. Ehmke and ACI Established the Third Accord and Satisfaction Element.

The final accord and satisfaction element is that: "the party asserting the defense fully performed the duties it agreed to perform under the later contract." *Bd. of Cnty. Comm'r of Adams Cnty.*, 511 P.3d at 704. At trial, Mr. Homuth contended that Ms. Ehmke and ACI did not comply with the terms of the March 2017 Agreement. However, the evidence is otherwise.

Under the Payout Terms, Ms. Ehmke and ACI were required to make 10 payments of $750 for an aggregate of $7,500 in 2017.  ACI actually made nine payments totaling $8,250 during that period.  In other words, ACI paid more quickly (in nine payments rather than 10) and also overpaid by $750 ($8,250 rather than $7,500) in 2017.  So, at that stage, Ms. Ehmke and ACI had a credit.  The next year, 2018, ACI paid 12 installments of $750 for a total of $9,000, which was exactly as required in the Payout Terms.  In his July 23, 2018 e-mail, Mr. Homuth acknowledged that all payments were satisfied and stated "I REALLY appreciate what you are doing."  In 2019, ACI made 11 payments of $750 totaling $8,250.  So, it may have appeared that Ms. Ehmke and ACI were short by $750.  However, as set forth above, ACI had previously overpaid by $750 in 2017.  Applying that credit in 2019, Ms. Ehmke and ACI were square with their obligations under the March 2017 Agreement.  Finally, in 2020, per the Payout Terms, Ms. Ehmke and ACI were required to make 12 payments of $750.  The evidence proves that ACI paid 11 installments totaling $9,000 with the last payment on November 17, 2020.  So, ACI completed its obligation to pay an aggregate of $34,500 under the Payout Terms early.

Notwithstanding the foregoing. Mr. Homuth continues to argue that Ms. Ehmke and ACI failed to comply with the Payout Terms.  Frankly, the Court does not understand the argument.  Apparently, Mr. Homuth contends that Ms. Ehmke and ACI were mandated to make monthly payments on the first of each month.  However, the Payout Terms do no state that monthly payments were required and do not mandate payments by the first of the month.  Instead, the Payout Terms required 10 or 12 payments annually.  Ms. Ehmke and ACI complied albeit that ACI sometimes overpaid and paid early.  Nevertheless, Mr. Homuth declared a default in his December 12, 2019 letter.  But there was no default under the Payout Terms at that stage.  So, the alleged default was wrongfully declared.[59]  And, then, Mr. Homuth started to demand more than was due under the March 2017 Agreement.  Accordingly, if anyone breached the March 2017 Agreement, it was Mr. Homuth.

The Court finds as a matter of fact (and alternatively as a matter of law), that Ms. Ehmke and ACI fully satisfied their obligations under the March 2017 Agreement.  Accordingly, any remaining debt on the Promissory Note was extinguished by full satisfaction of the accord.  *Bakehouse & Assoc., Inc. v. Wilkins*, 689 P.2d 1166, 1168 (Colo. App. 1984) ("An agreement to modify an existing contract, *i.e.,* an executory accord, does not extinguish the original obligation, but suspends performance of that

---

[59]     Starting in 2020, Mr. Homuth also began including restrictive notations on 10 of 11 checks paid by ACI writing: "Under Protest as to Amount Paid" or "Cashed Under Protest of Amount."  But Mr. Homuth cashed them all.  The restrictive endorsements written on the checks by Mr. Homuth are of no real moment.  By the time he started his notation exercise, he had already accepted almost three years' worth of payments without such indorsements.  In any event, such notations do "not alter the well-established law of accord and satisfaction."  *R.A. Reither Constr.*, 680 P.2d at 1344-5 ("Under the law of accord and satisfaction if . . . a check is tendered in full satisfaction of an obligation, acceptance and negotiation of the check by the obligee discharges the underlying obligation notwithstanding a restrictive endorsement on the check by the obligee.").

obligation until the accord is breached or satisfied.  If the accord is satisfied, the original obligation is discharged under the doctrine of accord and satisfaction.").

### 5.     The Court Rejects Mr. Homuth's Waiver Argument.

In the Homuth-Ehmke Response and Homuth-ACI Response, and also at trial, Mr. Homuth insisted that the accord and satisfaction defense asserted by Ms. Ehmke and ACI to the Homuth Claims had been waived in the State Court Case.  Mr. Homuth contended that because Ms. Ehmke and ACI had not asserted an affirmative defense of "accord and satisfaction" in their State Court Answer, the defense was waived.

In 2020, Mr. Homuth commenced the State Court Case against Ms. Ehmke and ACI.  Then, on September 16, 2020, Ms. Ehmke and ACI filed the State Court Answer wherein they denied liability to Mr. Homuth for breach of contract.  But, they did not use the phrase "accord and satisfaction."  Instead, Ms. Ehmke and ACI asserted a host of affirmative defenses including that "[Mr. Homuth] is estopped by his own conduct to claim any right to damages," "[Mr. Homuth] is seeking to recover more than he is entitled to in this matter," and "[Ms. Ehmke and ACI] performed all duties they owed [Mr. Homuth]."  The State Court Case was hotly contested for about two years.  However, no trial was conducted.  The State Court did not enter judgment on any claims, affirmative defenses, or counterclaims asserted in the State Court Case before Ms. Ehmke commenced the Ehmke Case in the Bankruptcy Court. The State Court made no determination that Ms. Ehmke and ACI had waived the affirmative defense of accord and satisfaction.  The Court has no evidence about the State Court Case other than the foregoing.

Mr. Homuth's theory is that Ms. Ehmke and ACI did not expressly advance an accord and satisfaction theory in the State Court Answer (or in the intervening period while the State Court Action was pending before the Petition Date), so they are barred from relying on accord and satisfaction to object to the Homuth Claims.  Mr. Homuth relies on state procedural law.  Colo. R. Civ. P. 8(c) states:  "In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction [and other affirmative defenses] . . . ."  Mr. Homuth quotes *Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc.*, 411 P.3d 1126, 1135 (Colo. App. 2016) for the proposition that: "Under C.R.C.P. 8(c), a defendant waives all affirmative defenses and avoidances that do not appear in his or her answer."  And, Mr. Homuth also refers to two other Colorado cases:  *Town of Carbondale v. GSS Props., LLC*, 169 P.3d 675, 681 (Colo. 2007) and *Duke v. Pickett*, 451 P.2d 288, 290 (Colo. 1969).

Although the passage quoted by Mr. Homuth in *Hawg Tools*, 411 P.3d at 1135, appears in the decision, Mr. Homuth ignores the context and exceptions.  First the context.  In *Hawg Tools*, the appellate panel concluded that the "defendants waived it [the preemption affirmative defense] because they raised it for the first time in their motion for judgment notwithstanding the verdict [after trial]."  *Id.* at 1135.  Factually, that scenario is quite different than the current dispute.  The State Court Case did not proceed to trial.  It was stayed by the bankruptcy filings in the Ehmke Case and the ACI

Case.  In another decision cited by Mr. Homuth, *Duke*, 451 P.2d at 290, the trial court erroneously "injected into the case [after the trial] a defense which was not pleaded and which was not tried by the parties."  So be it.  But this Court is not interjecting some new theory.  Instead, the Court is only adjudicating issues raised in the Ehmke Objection, Ehmke Amended Objection, and ACI Objection.  The accord and satisfaction theory was raised from the get-go in the Bankruptcy Court.

That leaves *Town of Carbondale*, 169 P.3d 675, which contains the most fulsome discussion of affirmative defense waiver in Colorado state court.  The decision provides a whole series of exceptions to the general proposition that "a defendant waives all affirmative defenses and avoidances that do not appear in his or her answer."  Instead, the Colorado Supreme Court acknowledged that in some instances, affirmative defenses may be raised for the first time on summary judgment.  *Id.* at 679.  And then, there are more exceptions surrounding amendments:  "If the time for amending pleadings as a matter of course has expired, an amendment [and addition of a new affirmative defense] can occur [1] with leave of court, [2] with written consent of the adverse party, or [3] '[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties."  *Id.* (citing Colo. R. Civ. P. 15(a)-(b)).

So, although Mr. Homuth seems to suggest some sort of self-executing rule that "a defendant waives all affirmative defenses and avoidances that do not appear in his or her answer," the procedural rule plainly is not self-executing and is subject to exceptions.  Ms. Ehmke and ACI might have been able to file a motion to amend the State Court Answer and expressly include "accord and satisfaction" as a defense.  In their post-trial legal brief, Ms. Ehmke and ACI argue exactly that:  "the Debtors could have amended the state court [answer] at any time prior to trial with leave of court under Fed. R. Civ. P. 15."  Perhaps the State Court would have granted the motion; or maybe not.  Perhaps, Ms. Ehmke and ACI might have argued that the other affirmative defenses set forth in the State Court Answer encompassed "accord and satisfaction."  For example, Ms. Ehmke and ACI asserted that "[Mr. Homuth] is estopped by his own conduct to claim any right to damages," "[Mr. Homuth] is seeking to recover more than he is entitled to in this matter," and "[Ms. Ehmke and ACI] performed all duties they owed [Mr. Homuth]."  Perhaps the State Court would have found accord and satisfaction somewhere in there; or maybe not.  And maybe the issue of accord and satisfaction would have been tried in the State Court Case by express or implied consent.  The Court has no way of knowing.  In the end, it becomes a speculative exercise because the State Court Case did not proceed to trial and the State Court never ruled that Ms. Ehmke and ACI had waived an accord and satisfaction defense.

All of this points out the folly of Mr. Homuth's position.  This Court is not in a position to second guess what might have happened in the State Court Case (in terms of amendments, motions, orders, and judgment) since the State Court Case was stopped before the State Court decided anything.  And, then, Mr. Homuth never comes to grips with the bankruptcy overlay.  Ms. Ehmke filed for bankruptcy protection in the Ehmke Case.  ACI filed for bankruptcy protection in the ACI Case.  Then, Mr. Homuth filed the Homuth Claims in this Court.  Ms. Ehmke submitted the Ehmke Objection and

the Ehmke Amended Objection.  ACI presented the ACI Objection.  All of the Objections are based on accord and satisfaction.  So, Mr. Homuth has had notice of the issue since at least October 25, 2022.  Mr. Homuth did not seek relief from stay to litigate the issues in the State Court Case.  Instead, he accepted adjudication in this Court.

The Bankruptcy Code and the Federal Rules of Bankruptcy Procedure establish a detailed framework for adjudication of claims and claims objections.  The submission of proofs of claims is governed by 11 U.S.C. § 501 and Fed. R. Bankr. P. 3001 and 3002.  After the Homuth Claims were filed, Ms. Ehmke and ACI were allowed to object to the Homuth Claims.  11 U.S.C. § 502(b); Fed. R. Civ. P. 3007.  The Objections triggered a "contested matter" under Fed. R. Bankr. P. 9014(a)-(c).  Contested matters typically are resolved on a fast track with fewer procedural requires than a typical state of federal lawsuit.  There is no complaint.  There is no answer.  The rules governing the pleading of affirmative defenses (such as Fed. R. Civ. P. 8(c) and Colo. R. Civ. P. 8(c)) presumptively do not apply.  *See* Fed. R. Bankr. P. 9014(c).  Then, factual disputes are set for trial.  This is the procedure that the Court followed which provided Mr. Homuth with notice, an opportunity to respond, and full due process.

What Mr. Homuth now asks the Court to do (find a waiver of the accord and satisfaction defense raised by Ms. Ehmke and ACI) is antithetical to the bankruptcy process.  It is almost as if Mr. Homuth is asking the court to import a theory such as collateral estoppel, res judicata, issue preclusion, or perhaps *Rooker-Feldman* to give effect to something that might have happened in the State Court Case (waiver of accord and satisfaction) but did not.  Plainly, there has been no final decision of the State Court about the topic.  In any event, the Court notes that Mr. Homuth has not provided the Court with a single citation to a decision in the bankruptcy context prohibiting a debtor from objecting to a claim on the basis that the objection had not been raised expressly or timely in a pre-bankruptcy state court action as an affirmative defense.  The Court has searched high and low but has been unable to find any case law support for Mr. Homuth's theory.[60]

There is another reason why the Court is reticent to accept Mr. Homuth's position.  It seems to be based on applying Colorado state procedural law in the context of federal bankruptcy claims disputes.  As a matter of general federal procedural law,

---

[60]   The Court acknowledges that Mr. Homuth has referenced 11 U.S.C. § 558 which states:  "The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses.  A waiver of any defense by the debtor after the commencement of the case does not bind the estate."  The last sentence of the foregoing statute plainly does not apply because the debtor has not waived "any defense" "after the commencement of the case."  That leaves only the first sentence of the statute for consideration.  The Court sees nothing there except the idea that the estate has the benefit of all defenses available to the debtor.  Mr. Homuth apparently sees something more.  He refers the Court to *Matter of Wey*, 827 F.2d 140, 142 (7th Cir. 1987).  In dicta, the court noted: "*Collier on Bankruptcy* points out, '[t]he trustee, however, is bound by any waiver of a defense made by the debtor *before* the filing of the petition in bankruptcy."  The Court accepts the passage but has been unable to find a waiver of a defense made by Ms. Ehmke and ACI before the bankruptcy.  The most that can be said is that the State Court Answer did not expressly identify "accord and satisfaction."

federal courts focus mainly on due process in the context of Fed. R. Civ. P. 8(c) waiver arguments.[61]   The Tenth Circuit Court of Appeals recently explained:

> The general rule is that a party waives its right to raise an affirmative defense at trial when the party fails to raise the defense in its pleadings. *Hassan v. U.S. Postal Service,* 842 F.2d 260, 263 (11th Cir.1988).  However, in considering this rule, we must keep in perspective that "the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses." *Id.* Therefore, "[w]e must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule." *Id.*  Rule 8(c)'s ultimate purpose is
>
>> simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it.  When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue.
>
> *Id.* (citation omitted).  Although it would have been preferable for CCC to raise the defense earlier, in light of the circumstances, we conclude the district court did not err by allowing CCC to supplement its brief, nor did it err — much less plainly err — by allowing CCC to present evidence on the issue of authority.  Because we conclude, for the reasons discussed below, that Ms. Kreisler had notice of the defense of lack of authority and, therefore, suffered no prejudice from CCC's failure to comply with Rule 8(c), we see no error in the court's decision.

*Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009).

The Court concurs with the *Creative Consumer*, 563 F.3d 1070, approach.  Mr. Homuth was advised about the accord and satisfaction defense raised by Ms. Ehmke and ACI since at least October 25, 2022, when Ms. Ehmke filed the Homuth-Ehmke Objection.  In fact, that defense was the central feature of the Ehmke Objection, Ehmke Amended Objection, and ACI Objection.  Mr. Homuth had a fair and full opportunity

---

[61]    The Court acknowledges that Fed. R. Civ. P. 8(c) does not technically apply in the specialized bankruptcy procedure for claims objections.

during the pre-trial process to conduct discovery on the topic and pursue pre-trial motions.  During the trial, he had complete reign to present evidence on the accord and satisfaction defense and he did so.  So, in this Court's view, under the unique circumstances of this dispute, the accord and satisfaction defense should be adjudicated on the merits, not decided based on a tortured application of Colorado procedural law in the State Court Case which never reached trial.

### 6.     <u>Other Objections to the Homuth Claims</u>.

Ms. Ehmke and ACI have raised other defenses to the Homuth Claims beyond just accord and satisfaction.  One issue raised in the Ehmke Objection and at trial is that Mr. Homuth failed to establish the amount of damages he may be entitled to based on his assertion of breach of the Promissory Note.  Although the Court decides the dispute based upon the accord and satisfaction doctrine, it is worth noting that the Court received very cursory and conflicting evidence about amounts allegedly owed by Ms. Ehmke and ACI to Mr. Homuth (assuming there was no accord and satisfaction).

The Court admitted the Promissory Note which stated an original principal balance of $379,100.64.  Mr. Homuth acknowledged that he had no documentation supporting the amount of the Promissory Note.  In any event, assuming the validity of the Promissory Note, neither side provided the Court with an accounting of all the payments under the Promissory Note (whether by Ms. Ehmke, ACI, Mr. Campbell, or Mr. Conley).  The Court was able to determine, by laborious review of some of the pages of ACI's check register and some cancelled checks, that ACI paid at least $199,181.85 from 2006 through 2015 (or maybe more).  Mr. Homuth acknowledged at least $15,600 in additional payments in 2016, but that is based only on an e-mail.  And, Exhibit D (at 7-10) is a spreadsheet called "Cash Flow Data" that suggests that the Promissory Note was paid off in full on December 31, 2016 with a final payment of $99,430.01.  The Court also notes that ACI made $34,500 in payments under the March 2017 Agreement.

Based on the foregoing evidence, the Court would have no basis for determining a specific amount owed to Mr. Homuth under the Promissory Note even if there was not an accord and satisfaction.  Mr. Homuth's own exhibits illustrate the problem.  The Homuth Claim Summary attached to the Homuth-Ehmke Claim and the Homuth-ACI Claim asserts "Balance of Loan as of 12/31/15: $155,994."  But the Payout Terms state "12-31-15 due from ACID balance sheet: $171,076."  Which is it?  The Court has no way of knowing.  On the Homuth Claim Summary, Mr. Homuth asserts "Payments made by ACI in 2017: $6,000."  But that figure is plainly erroneous since, as set forth above, ACI paid at least $8,250 to Mr. Homuth in 2017.  Similarly, on the Homuth Claim Summary, Mr. Homuth asserts "Payments made by ACI in 2020: $6,750."  Again, that amount is incorrect since, as set forth above, ACI paid at least $9,000 in 2020.  On his March 6, 2017 e-mail (which forms the basis of the March 2017 Agreement), Mr. Homuth asserted that the "actual debt" in March 2017 was "$125,476."  But the Homuth Claim Summary shows a "Balance of Loan" of between $146,101.60 and $140,010.00 for 2017.  Again, the numbers do not match up.  All the foregoing errors also mean that

Mr. Homuth's claims for interest on his assertions of the balances due are obviously wrong too.

None of the foregoing evidentiary problems even address Mr. Homuth's further inflation of the Homuth Claims by somehow rescinding various gifts from over a decade ago and then adding the allegedly cancelled gifts ($13,000 in 2012; $14,000 in 2013; $14,000 in 2014; and $14,000 in 2015) back as some sort of obligation under the Promissory Note.  And, there was no evidence (not even an attorney invoice) about the very high amount of attorney's fees and costs being asserted by Mr. Homuth ($81,098.63).

7.    **Conclusion.**

The Court reiterates that Ms. Ehmke and ACI have proven their accord and satisfaction defense to the Homuth Claims.  Accordingly, the Homuth Claims are disallowed as already having been satisfied.  Even if accord and satisfaction did not apply, the Court has no evidentiary basis to determine the specific amount of the Homuth Claims because Mr. Homuth failed in his burden to provide such information.

## VI.    **Final Decision and Judgment.**

For the reasons set forth above, the Court:

ORDERS that the Homuth-Ehmke Claim and the Homuth-ACI Claim are disallowed in their entirety.  A separate Judgment shall enter disallowing the Homuth Claims based upon this Memorandum Opinion After Trial.

DATED this 21st day of April, 2023.

BY THE COURT:

_Thomas B. McNamara_
Thomas B. McNamara
United States Bankruptcy Judge